1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LEE EDWARD HUGHES, | CV F   04-5756 AWI DLB HC |
| Petitioner, | FINDINGS AND RECOMMENDATIONS REGARDING PETITION FOR WRIT OF HABEAS CORPUS |
| v. | [Doc. 1] |
| JAMES A. YATES, Warden, | |
| Respondent. | |

_____/

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

### BACKGROUND

On May 5, 1995, in the Kern County Superior Court, Petitioner was convicted of two counts of second degree robbery (former Cal. Penal Code § 212.5(b)), and felony evasion of a peace officer (Cal. Veh. Code § 2800.2). (CT 594.) The jury also found true the allegation that Petitioner personally used a knife during the commission of one of the robberies. The court found true the allegation that Petitioner has suffered three prior "strike" convictions within the meaning of California Penal Code§ 667(c)-(j), and that he had suffered several prior convictions for which he served prison terms. (Id.)

On July 20, 1995, the court sentenced Petitioner to three consecutive 25-to-life sentences, and stayed execution of sentence on the remaining enhancements. (Id.)

Petitioner timely appealed to the California Court of Appeal, Fifth Appellate District. On January 30, 1997, the Fifth District Court of Appeal affirmed Petitioner's conviction in an

1

1   unpublished opinion, but remanded the case for the trial court to reconsider the stay of the

2   enhancements and so that Petitioner could make a motion to dismiss the prior "strike"

3   convictions for sentencing purposes.  (Respondent's Exhibit D.)

4        Petitioner did not petition the California Supreme Court for review, and on April 3, 1997,

5   a remittitur issued.  (Respondent's Exhibit E.)

6        On April 21, 1997, Petitioner filed his first state habeas corpus petition in the Kern

7   County Superior Court which was denied on April 24, 1997.  (Respondent's Exhibit F.)

8        On May 22, 1997, the trial court re-sentenced Petitioner to a prison term totaling 81 years

9   to life in state prison.  (Respondent's Exhibit M.)

10        On March 26, 1996, Petitioner filed an application to file a belated notice of appeal in the

11   Fifth District Court of Appeal.  (Respondent's Exhibit G.)  On March 29, 1999, the Fifth District

12   deemed Petitioner's application to be a writ of habeas corpus and issued a writ allowing

13   Petitioner to file a notice of appeal with the Kern County Superior Court within 30 days.

14   (Respondent's Exhibit G.)  Petitioner did not file a notice of appeal.

15        On July 24, 1996, Petitioner filed his second petition for writ of habeas corpus in the

16   Kern County Superior Court which was denied on August 5, 1998.  (Respondent's Exhibit H.)

17        On October 6, 1998, Petitioner filed his third petition for writ of habeas corpus, his first

18   in the California Court of Appeal, Fifth Appellate District.  (Respondent's Exhibit I.)  The

19   petition was denied on October 23, 1998.  (Id.)

20        On November 18, 1999, Petitioner filed his fourth petition for writ of habeas corpus, his

21   second in the California Court of Appeal, Fifth Appellate District, seeking an opportunity to once

22   again file a belated notice of appeal.  (Respondent's Exhibit J.)  On June 27, 2000, the court

23   granted the petition.  (Id.)

24        On February 14, 2001, Petitioner again appealed to the California Court of Appeal, Fifth

25   Appellate District.  The Fifth District Court of Appeal affirmed Petitioner's conviction.

26   (Respondent's Exhibit M.)

27        On April 17, 2001, Petitioner filed his fifth petition for writ of habeas corpus, his third in

28   the California Court of Appeal, Fifth Appellate District.  (Respondent's Exhibit N.)  On

1  September 6, 2001, the Court denied the petition.  (Id.)

2  On April 10, 2002, Petitioner filed his sixth petition for writ of habeas corpus, his first in

3  the California Supreme Court.  (Respondent's Exhibit O.)  The petition was denied on November

4  13, 2002.  (Id.)

5  On April 11, 2002, Petitioner petitioned the California Supreme Court for review of the

6  Court of Appeal's affirmation of Petitioner's conviction.  (Respondent's Exhibit P.)  Review was

7  denied May 15, 2002.  (Id.)

8  On July 23, 2003, Petitioner filed his seventh petition for writ of habeas corpus, his third

9  in the Kern County Superior Court, which was denied on October 8, 2003.[1]

10  On October 28, 2003, Petitioner filed his eighth petition for writ of habeas corpus, his

11  fourth in the California Court of Appeal, Fifth Appellate District.  (Respondent's Exhibit R.)

12  On March 17, 2004, Petitioner filed his ninth petition for writ of habeas corpus, his

13  second in the California Supreme Court.[2]  The petition was denied on May 12, 2004.

14  Petitioner filed the instant federal petition for writ of habeas corpus on May 25, 2004.

15  Respondent filed an answer to the petition on October 13, 2004, and Petitioner filed a traverse on

16  April 5, 2005.

17  STATEMENT OF FACTS

18  **March 12, 1994, Robbery**

19  At approximately 1:40 p.m. on Saturday, March 12, 1994, Betty Koelzer was working as

20  a cashier at the ARCO "AM/PM" located at 900 Monterey Street in Kern County.  (RT II at 59,

21  79.)  A man, who Koelzer identified in court as Petitioner, entered the store, walked over to the

22  egg rack, and then walked up to the cash register.  (RT II at 60, 62-64.)  Koelzer rang up the eggs

23  and asked if there would be anything else.  (RT II at 63.)  Petitioner leaned over the counter,

24  stuck a long steak knife at Koelzer and told her to "open it."  (RT II at 63, 77.)  When Koelzer

25  ───────────

26  [1] After his petition was denied, Petitioner sent a letter to the court requesting clarification on its ruling. (Respondent's Exhibit Q.)  On October 31, 2003, the court reiterated its ruling and denied Petitioner's request for

27  reconsideration.  (Id.)

28  [2] The petition was not timely filed, however, Petitioner filed an application for relief from default and was granted permission to file.  (Respondent's Exhibit S.)

3

1  stepped back, out of Petitioner's reach, Petitioner stated, "I am counting." (RT II at 64, 77.)

2  Koelzer was scared and cried, as she opened the cash register and stepped back. (RT II at 64.)

3  Petitioner grabbed the money from the register, ran out the front door and headed left. (RT II at

4  64, 68-69.) Koelzer yelled to Shawn Horton, who was working in the back of the store, and

5  pushed a button signaling him to come to the front of the store. (RT II at 67, 76, 84.) Koelzer

6  told Horton that she had just been robbed and pointed out the window at Petitioner. (RT II at 85-

7  86.) Horton immediately ran out the back door of the store and began chasing Petitioner. (RT II

8  at 86-87.)

9  Horton chased Petitioner down an alley and through the surrounding neighborhood,

10  yelling "stop." (RT II at 87.) After approximately eight to ten minutes, Petitioner got into a car

11  that he and Horton had passed before and drove away. (RT II at 88-89, 94.) Horton described

12  the vehicle as dating from the 1970s and being a faded light brown color. (RT II at 89.) The car

13  was parked less than a block from the "AM/PM" store, at the end of the alley. (RT II at 100.)

14  On March 14, 1995, Koelzer identified Petitioner as the man who robbed her in a

15  photographic line up put together by the Bakersfield Police Department. (RT II at 65, 173-174.)

16  **March 13, 1994, Robbery**

17  Just before 1:00 a.m. on March 13, 1994, Satwant Gill was working at the "AM/PM"

18  store located in Kern County. (RT II at 188-189.) A man, whom Gill identified in court as

19  Petitioner, entered the store, took a bottle of beer from the cooler and placed it on the counter.

20  (RT II at 190.) He noticed that Petitioner was limping. (RT II at 198, 215, 217.) When Gill

21  asked Petitioner if that would be all, Petitioner stated, "yeah." (RT II at 190.) After Gill rang up

22  the sale on the cash register Petitioner stated, "No. Wait a minute. I have to get another beer."

23  (Id.) Upon returning to the counter, Petitioner held a kitchen knife towards Gill. (RT II at 190-

24  191.) Petitioner told Gill to "open the drawer." (RT II at 191, 193, 201, 201.) After Gill did so,

25  Petitioner told Gill to put the money from the drawer in a bag. (RT II at 191.) Gill put the

26  money, approximately $100, and the beer, in the bag. (RT II at 192, 203.) Petitioner told Gill

27  that, if he called anyone, his friends would come and kill Gill. (RT II at 192.) Petitioner then left

28  the store. (RT II at 192.)

**Felony Evasion**

Shortly after 1:00 a.m. on March 13, 1994, Detective Leonard Prudhomme of the Bakersfield Police Department was driving his vehicle eastbound on Highway 178 approaching Beale Avenue, when he was advised, over his police radio, that a robbery had occurred in the Beale area. (RT II at 161-162.) Detective Prudhomme was informed that the vehicle involved was tan with four doors. (RT II at 163-164.) Pursuant to the direction of one of the patrol sergeants, Detective Prudhomme took up a stakeout position northbound on Beale Avenue. (RT II at 163.) Approximately five to seven minutes later, Detective Prudhomme saw a vehicle matching the broadcasted description travel southbound on Beale from the Highway 178 off-ramp. (RT II at 164.) The off-ramp was approximately a mile and a half from the "AM/PM" store that had just been robbed. (RT II at 186.) Detective Prudhomme began following the vehicle. (RT II at 164.) Realizing that the police patrol units were several minutes away, Detective Prudhomme decided to attempt to stop the vehicle himself. (RT II at 165.) Detective Prudhomme, who was driving an unmarked police car, activated the interior red light of his vehicle. (RT II at 165.) The suspect vehicle pulled over to the side of the road, slowed its speed considerably and stopped. (RT II at 165.) As Detective Prudhomme pulled in behind the vehicle and began to park, the suspect vehicle began to move again at a speed of less than fifteen miles an hour. (RT II at 165.)

Detective Prudhomme followed the vehicle, which continued to move slowly. (RT II at 165.) Thereafter, a marked black and white police car occupied by Officers Grubbs and Rice fell in line behind the suspect vehicle; the suspect vehicle accelerated its speed rapidly. (RT II at 165, 237, 239-240; RT III at 268.) Detective Prudhomme remained approximately two to three car lengths behind the patrol car; the patrol car, in turn, was approximately seven to eight car lengths behind the suspect vehicle. (RT II at 166.) Both the siren and red and blue lights of the patrol car were on. (RT II at 166, 240.)

The chase ended when the suspect vehicle made a turn, jumped the curb and became wedged between a telephone pole and residential backyard fence. (RT II at 168-169, 242.) Just prior to the crash, the suspect vehicle was approaching fifty miles per hour and "fish-tailing."

1   (RT II at 242.)  Detective Prudhomme estimated that the chase lasted no more than a minute and

2   a half and spanned approximately three to four blocks.  (RT II at 171, 183.)  Officer Grubbs

3   stated that the suspect vehicle continually accelerated throughout the chase and "ran" through at

4   least one stop sign without stopping.  (RT II at 246-247.)

5       Following the crash, Petitioner, the driver of the suspect vehicle, attempted to exit the car

6   through the right front passenger window.  Two patrol officers took him into custody.  (RT II at

7   170-171, 251; RT III at 268.)  In Petitioner's left front pants pocket was $86 in five and one

8   dollar bills.  (RT II at 245, 248; RT III at 270.)

9       Shortly thereafter, Gill identified Petitioner at the scene as the man who had robbed him

10  earlier.  (RT II at 196-197, 210, 216, 223.)

11  **Defense**

12      At trial, Petitioner did not take the stand to testify on his own behalf.  However, Austin

13  Bryan, Petitioner's brother-in-law, testified that he "guessed" that Petitioner, who usually wrote

14  checks, had money with him on March 12, 1995.  (RT III at 299.)

15                                  DISCUSSION

16  A.   Jurisdiction

17      Relief by way of a petition for writ of habeas corpus extends to a person in custody

18  pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws

19  or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor,

20  529 U.S. 362, 375, 120 S.Ct. 1495, 1504, n.7 (2000).  Petitioner asserts that he suffered

21  violations of his rights as guaranteed by the U.S. Constitution.  The challenged conviction arises

22  out of the Kern County Superior Court, which is located within the jurisdiction of this Court.  28

23  U.S.C. § 2254(a); 2241(d).

24      On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act

25  of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its

26  enactment.  Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997; Jeffries v. Wood, 114

27  F.3d 1484, 1499 (9th Cir. 1997), cert. denied, 522 U.S. 1008, 118 S.Ct. 586 (1997) (quoting

28  Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), cert. denied, 520 U.S. 1107, 117 S.Ct.

6

1  1114 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059

2  (1997) (holding AEDPA only applicable to cases filed after statute's enactment).  The instant

3  petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

4  B.     Standard of Review

5          This Court may entertain a petition for writ of habeas corpus "in behalf of a person in

6  custody pursuant to the judgment of a State court only on the ground that he is in custody in

7  violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

8          The AEDPA altered the standard of review that a federal habeas court must apply with

9  respect to a state prisoner's claim that was adjudicated on the merits in state court.  Williams v.

10  Taylor, 120 S.Ct. 1495, 1518-23 (2000).  Under the AEDPA, an application for habeas corpus

11  will not be granted unless the adjudication of the claim "resulted in a decision that was contrary

12  to, or involved an unreasonable application of, clearly established Federal law, as determined by

13  the Supreme Court of the United States;" or "resulted in a decision that was based on an

14  unreasonable determination of the facts in light of the evidence presented in the State Court

15  proceeding." 28 U.S.C. § 2254(d); Lockyer v. Andrade,123 S.Ct.1166 (2003) (disapproving of

16  the Ninth Circuit's approach in Van Tran v. Lindsey, 212 F.3d 1143 (9th Cir. 2000)); Williams v.

17  Taylor, 120 S.Ct. 1495, 1523 (2000).  "A federal habeas court may not issue the writ simply

18  because that court concludes in its independent judgment that the relevant state-court decision

19  applied clearly established federal law erroneously or incorrectly."  Lockyer, at 1175 (citations

20  omitted).  "Rather, that application must be objectively unreasonable."  Id. (citations omitted).

21          While habeas corpus relief is an important instrument to assure that individuals are

22  constitutionally protected, Barefoot v. Estelle, 463 U.S. 880, 887, 103 S.Ct. 3383, 3391-3392

23  (1983); Harris v. Nelson, 394 U.S. 286, 290, 89 S.Ct. 1082, 1086 (1969), direct review of a

24  criminal conviction is the primary method for a petitioner to challenge that conviction.  Brecht v.

25  Abrahamson, 507 U.S. 619, 633, 113 S.Ct. 1710, 1719 (1993).  In addition, the state court's

26  factual determinations must be presumed correct, and the federal court must accept all factual

27  findings made by the state court unless the petitioner can rebut "the presumption of correctness

28  by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); Purkett v. Elem, 514 U.S. 765, 115

S.Ct. 1769 (1995); Thompson v. Keohane, 516 U.S. 99, 116 S.Ct. 457 (1995); Langford v. Day, 110 F.3d 1380, 1388 (9th Cir. 1997).

C.      Prosecutorial Misconduct - Use of False Testimony

Petitioner contends that the prosecutor knowingly used false evidence when she "allowed a police detective to testify falsely that he received a radio broadcast of a vehicle fleeing the scene of the robberies that matched the description of the vehicle that Petitioner was driving."

A petitioner is entitled to habeas corpus relief if the prosecutor's misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly v. DeChristoforo, 416 U.S. 637, 643, 94 S.Ct. 1868, 1871 (1974).   To constitute a due process violation, the prosecutorial misconduct must be "of sufficient significance to result in the denial of the defendant's right to a fair trial." Greer v. Miller, 485 U.S. 756, 765, 107 S.Ct. 3102, 3109 (1987), quoting United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, (1985).  Any claim of prosecutorial misconduct must be reviewed within the context of the entire trial.  Id. at 765-66, 107 S.Ct. at 3109; United States v. Weitzenhoff, 35 F.3d 1275, 1291 (9th Cir. 1994).  The court must keep in mind that "[t]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor" and "the aim of due process is not punishment of society for the misdeeds of the prosecutor but avoidance of an unfair trial to the accused." Smith v. Phillips, 455 U.S. 209, 219, 102 S.Ct. 940, 979 (1982).  "[A] conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." Bagley, 473 U.S. at 678 (quoting United States v. Agurs, 427 U.S. 97, 103 (1976).

As Respondent submits, the prosecutor fully acknowledged at the pretrial hearing that, to her knowledge, none of the individuals involved in the March 13, 1994, robberies gave a vehicle description.  Petitioner's trial counsel choose not to question Detective Prudhomme about whether a vehicle description was actually put out on the police radio.  Instead, defense counsel strategically used the discrepancy to his advantage.  During closing argument, defense counsel argued the following:

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

> If I heard [Detective Prudhomme] correctly, when he took his position out there at Beale and 178 that evening at shortly before one a.m., he had no knowledge of the reported robbery and attempted robbery that had occurred on the 12th. That is my recollection of his testimony. He didn't have any knowledge of those purported incidents.
>
> Now, again, if I was, and I know that as all of us do, when you are sitting for a period of time, I zoned out a couple times, but I don't recall either Miss Stevenson or Mr. Gill - - and I believe my recollection is correct about this  - - either Miss Stevenson or Mr. Gill, the two alleged incidents in the early morning hours of the 13th, neither of them said anything about a suspect vehicle.
>
> They were the only people in the store. They stayed in the store. They called 911. They saw the person exit the store, but they never saw the person get into a vehicle.
>
> She saw the person get out of a vehicle before they came in the store. I think I recall asking each of them that question.
>
> Nothing is said at 12:48 a.m. in that call, that robbery call or attempted robbery call about a suspect vehicle.
>
> Neither of those victims saw the suspect get into a vehicle, a brown sedan or any other kind of vehicle.
>
> So my concern, my curiosity, is why did Detective Prudhomme stop this vehicle. Why did he stop this vehicle?
>
> He heard a report of an attempted robbery, and several minutes later, a report of a robbery and a general description of a suspect, a black man in a blue jacket, a black man in a beige sweat-shirt. Nothing whatsoever about fleeing in a vehicle, so I'm not sure why he decided to follow the vehicle that [Petitioner] was in that night, but he did.

(RT 357-358.)

Petitioner's claim really amounts to nothing more than a challenge to Detective Prudhomme's credibility, an issue fully argued at trial and properly put to the jury. See Carothers v. Rhay, 594 F.2d 225, 229 (9th Cir. 1979) (rejecting use of perjured testimony claim and request for evidentiary hearing where issue was credibility and it was properly presented to the jury.) There is no factual allegation presented that was not fully explored at trial. As such, Petitioner's claim fails.

In any event, Petitioner has not demonstrated a reasonable likelihood that the alleged false testimony could have affected the outcome of the trial. During examination of Detective Prudhomme, when the prosecutor asked what vehicle description he heard over the police radio, Petitioner's trial counsel objected on hearsay grounds. (RT II at 163.) The trial court overruled the objection, and allowed the hearsay statement not for the truth of the matter, but rather for the limited purpose of explaining Detective Prudhomme's subsequent conduct. (RT II at 162-163.) Accordingly, the jury was instructed that they should not consider the statement for anything other than its limited purpose. (RT III at 310; CT II at 326.) As is apparent, there is no way that

an untrue statement could have had an effect on the trial when the jury was specifically instructed

that it could not consider the statement for its truth.  Further, both victims identified Petitioner as

being the man who robbed them, and law enforcement caught Petitioner in the car after the high

speed chase.  (RT II at 64, 170-171, 192.)  It is noteworthy that Petitioner was acquitted on

Counts Two (alleged attempted robbery of Bonnie Stevenson on March 13, 1994) and Four

(alleged attempted robbery of Johnny Salinas on March 12, 1994).  (CT 209, 214; 297, 300.)

Given the strength of the evidence, Detective Prudhomme's statement that he received a

description of the vehicle leaving the scene of the crime, even if false, did not reasonably effect

on the jury's verdict.

D.    Prosecutorial Misconduct - Destruction of Material Evidence

      Petitioner contends that he was denied due process by the prosecution's destruction of

material evidence.  Specifically, he claims that by depositing the currency that was recovered

from his person at the time of arrest in a police department bank account the prosecution

destroyed the evidentiary value of the currency and prevented him from showing it was not the

same money taken from the victim.

      This claim was first presented in Petitioner's seventh petition for writ of habeas corpus,

his third filed in the Kern County Superior Court.  (Respondent's Exhibit Q.)  The claim was

subsequently presented to the Court of Appeal, Fifth Appellate District, which denied it on the

merits.  (Respondent's Exhibit R.)  Petitioner sought review of this denial in the California

Supreme Court.  (Respondent's Exhibit S.)  The California Supreme Court denied the claim on

the merits in a summary denial.  (Id.)

      Failure to provide exculpatory evidence: The prosecution's suppression of evidence

favorable to the accused violates due process when the evidence is material to guilt or to

punishment.  See Brady v. Maryland, 373 U.S. 83, 87 (1963).  Evidence is material "only if there

is a reasonable probability that, had the evidence been disclosed to the defense, the result of the

proceeding would have been different."  United States v. Bagley, 473 U.S. 667, 682 (1985).  "[A]

constitutional error occurs, and the conviction must be reversed, only if the evidence is material

in the sense that its suppression undermines confidence in the outcome of the trial."  Id. at 678.

1    Satwant Gill was working as a cashier in an AM/PM mini-market when, at 1:00 a.m.,

2    Petitioner robbed him at knife point.  (RT II at 188-189, 191-192.)  Petitioner demanded that Mr.

3    Gill take the money out of the cash register and put it in a bag.  (RT II at 191-192.)  Mr. Gill was

4    not sure exactly how much money was in the cash drawer, but believed that it was approximately

5    $100 which could have been comprised of $10, $5 and $1 bills.[3]  (RT II at 192.)  When Petitioner

6    was arrested a short time later, Bakersfield police officer Ron Rice recovered $86 in cash from

7    his left front pant's pocket.  (RT III at 268-270.)  The $86 was comprised of six five-dollar bills

8    and 56 one-dollar bills.[4]  (RT III at 268-270, 272.)  After being booked into evidence, the money

9    was apparently, as is done in every case in which money was seized, deposited into the

10   Bakersfield Police Department's bank account.  (RT II at 177.)

11   As Respondent submits, Petitioner is unable to demonstrate that the currency in question

12   possessed material value so as to undermine the confidence in the outcome of his trial.  United

13   States v. Bagley, 473 U.S. at 678.  Petitioner claims that, "[t]he cash evidence seized from

14   [P]etitioner was material to the case, and exculpatory in nature because it tended to show that it

15   was not the same money taken from the victim."[5]  Petitioner appears to argue that the physical

16   currency had exculpatory value because it differed, slightly, from what Mr. Gill described.

17   As Respondent submits, although the actual currency was not introduced to the jury, the

18   description of it was.  The jury was aware of Mr. Gill's testimony, and aware of the actual

19   amount of currency recovered and what denominations of bills comprised that amount.  Further,

20   as Respondent argues, Petitioner does not suggest, and, given the fungible nature of $1, $5, and

21   $10 bills, it is not reasonable to presume, that Mr. Gill would have been able to identify the

22

23   ───────────────

     [3]  At the preliminary hearing, Mr. Gill testified that he thought it was approximately $80.  (CT Vol. 1 at 52.)

24

25   [4]  Officer Rice initially testified he recovered $58 from Petitioner.  (RT III at 270.)  He subsequently
     testified that he had no independent recollection of the amount, and refreshed his memory with the police report that
26   was prepared in the case.  (RT III at 270.)  After refreshing his memory he testified that the amount recovered was
     $86.  (RT III at 270.)  As is clear, Petitioner's assertion that "at the time of petitioner's arrest he had 56 to $58.00
27   dollars [sic] in his possession" is a misrepresentation of the testimony.

28   [5]  As Respondent submits, Petitioner made this assertion in his petition for review filed with the California
     Supreme Court, in which he raised the same issue he does here.  (Respondent's Exhibit S, at 14.)  The Court assumes
     that Petitioner is making the same argument in the instant petition.

1   actual bills taken from the cash register drawer.  Thus, there would be no additional exculpatory

2   value in presenting the actual bills taken.  At trial, Mr. Gill testified that there were more tens,

3   fives and ones in the cash drawer at the time of the robbery, but he did not remember exactly how

4   much money was taken, he approximated one hundred dollars.  (RT II at 192.)

5           In his traverse, Petitioner contends that the money seized from him was approximately

6   half the amount of what officers described and was in different denominations.  Petitioner

7   contends that he had only one or two $5 bills and $1 bills on him.  Thus, Petitioner argues that

8   the description and the amount of the money was false and the actual physical evidence of the

9   money seized was necessary to disprove the officer's testimony.

10          Even had the actual physical money been introduced at trial and contradicted the officer's

11  testimony, Petitioner has failed to demonstrate that it would have effected the jury's

12  determination.  As Petitioner argues in his traverse, the actual physical money would only have

13  served to attempt to discredit the officer's testimony.  Even if Petitioner had $56, $58, or no

14  money on him at the time of his arrest it would not change the fact that he was identified by both

15  victims as being the man who robbed them and led authorities on a high speed chase in a vehicle

16  similar to the one observed at the scene of one of the robberies.  (RT II at 64, 170-171, 192.)

17  Thus, it cannot be said that the failure to preserve this evidence undermined the confidence in the

18  outcome of the trial.

19  E.      Ineffective Assistance of Counsel

20          Petitioner claims that he was denied the right to effective assistance of counsel during his

21  trial.  Specifically, Petitioner cites the following claims of ineffectiveness: (1) trial counsel failed

22  to obtain impeachment evidence, (2) failed to effectively cross-examine and impeach a

23  prosecution witness, (3) failed to expose the falsity in the detective's testimony, (4) stated

24  erroneous facts in closing argument thereby lending credence to the prosecution's case and the

25  detective's false statements, (5) failed to develop a viable defense strategy, (6) failed to make

26  good on opening statements, (7) failed to interview the sole defense witness before putting him

27  on the witness stand, resulting in that witness providing testimony damaging to Petitioner's case,

28  (8) failed to properly investigate, (9) failed to file a "Pitchess" motion, (10) failed to make any

effort to obtain records of the cash evidence deposit, and (11) denied Petitioner the right to testify on his own behalf by failing to properly explain court rulings regarding the use of prior convictions for impeachment purposes.

These claims were first presented in Petitioner's seventh petition for writ of habeas corpus, his third filed in the Kern County Superior Court. (Respondent's Exhibit Q.)  The Superior Court denied the petition on its merits and, in the alternative, procedural grounds. (Id.) The claims were subsequently presented to the Court of Appeal, Fifth Appellate District, in Petitioner's eighth petition, his fourth to the Court of Appeal. (Respondent's Exhibit R.)  The Court of Appeal issued a summary denial of the claims. (Id.)  Petitioner sought review of this denial in the California Supreme Court. (Respondent's Exhibit S.)  The California Supreme Court also issued a summary denial of the claims. (Id.)

The law governing ineffective assistance of counsel claims is clearly established for the purposes of the AEDPA deference standard set forth in 28 U.S.C. § 2254(d). Canales v. Roe, 151 F.3d 1226, 1229 (9th Cir. 1998.)  In a petition for writ of habeas corpus alleging ineffective assistance of counsel, the court must consider two factors. Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064 (1984); Lowry v. Lewis, 21 F.3d 344, 346 (9th Cir. 1994).  First, the petitioner must show that counsel's performance was deficient, requiring a showing that counsel made errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment. Strickland, 466 U.S. at 687.  The petitioner must show that counsel's representation fell below an objective standard of reasonableness, and must identify counsel's alleged acts or omissions that were not the result of reasonable professional judgment considering the circumstances. Id. at 688; United States v. Quintero-Barraza, 78 F.3d 1344, 1348 (9th Cir. 1995).  Judicial scrutiny of counsel's performance is highly deferential.  A court indulges a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. Strickland, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064 (1984); Sanders v. Ratelle, 21 F.3d 1446, 1456 (9th Cir.1994).

Second, the petitioner must show that counsel's errors were so egregious as to deprive defendant of a fair trial, one whose result is reliable. Strickland, 466 U.S. at 688.  The court must

1    also evaluate whether the entire trial was fundamentally unfair or unreliable because of counsel's

2    ineffectiveness.  Id.; Quintero-Barraza, 78 F.3d at 1345; United States v. Palomba, 31 F.3d 1356,

3    1461 (9th Cir. 1994).  More precisely, petitioner must show that (1) his attorney's performance

4    was unreasonable under prevailing professional norms, and, unless prejudice is presumed, that

5    (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result would

6    have been different.

7         A court need not determine whether counsel's performance was deficient before

8    examining the prejudice suffered by the petitioner as a result of the alleged deficiencies.

9    Strickland, 466 U.S. 668, 697, 104 S.Ct. 2052, 2074 (1984).  Since it is necessary to prove

10   prejudice, any deficiency that does not result in prejudice must necessarily fail.

11        Ineffective assistance of counsel claims are analyzed under the "unreasonable

12   application" prong of Williams v. Taylor, 529 U.S. 362 (2000).  Weighall v. Middle, 215 F.3d

13   1058, 1062 (2000).  With this standard in mind, the Court will examine each claim of

14   ineffectiveness separately.

15        1.    Trial Counsel Failed to Obtain Impeachment Evidence[6]

16        Petitioner claims that trial counsel was ineffective for failing to obtain 911 tapes and

17   communications records that could have been used to impeach Detective Prudhomme's

18   testimony that he heard a vehicle description put out over the police radio prior to attempting to

19   stop Petitioner.  (Respondent's Exhibit S, at 16.)

20        Even assuming counsel was ineffective in failing to request the 911 tape, Petitioner has

21   not demonstrated any resulting prejudice.  Whether or not Detective Prudhomme heard a

22   broadcast of the vehicle description does not overcome the strong independent evidence

23   demonstrating Petitioner's guilt.  Both victims identified Petitioner as being the man who robbed

24   them, and law enforcement caught Petitioner in the car after the high speed chase.  (RT II at 64,

25   170-171, 192.)   Thus, there is not a reasonable probability that, but for counsel's error, the result

26   of the proceeding would have been different.  As such, Petitioner's claim fails.

27

28        [6] With regard to Petitioner's claims of incompetence, Petitioner makes bare assertions; therefore, the Court
     will assume that Petitioner is making the same arguments as he did before the California Supreme court, and will use
     that petition to provide detail to the current petition.

2.      Failure to Effectively Cross-Examine and Impeach Prosecution Witness

Petitioner contends that trial counsel was ineffective for failing to cross-examine and impeach Satwant Gill.  As Respondent correctly submits, it appears Petitioner bases his claim on the following: At trial, Mr. Gill, the victim of the March 13, 1994, robbery for which Petitioner was convicted, testified that he noticed that Petitioner was limping, as if concealing something in his pants leg, when he entered the store.  (RT II at 198, 212, 215, 217-219.)  At the preliminary hearing, Mr. Gill testified that he was not paying attention to how Petitioner walked when he entered the store and did not notice whether he was limping or not.  (CT I at 73.)  Petitioner claims that his trial counsel was ineffective for failing to point out this discrepancy at trial. (Respondent's Exhibit S, at 17.)

As Respondent submits, counsel's decision not to impeach Mr. Gill was likely a tactical choice.  Although it is true that there were conflicting statements given by Mr. Gill, given the fact that Petitioner has clearly conceded that he does, in fact, walk with a limp, the impeachment may have served to bolster Mr. Gill's trial identification testimony.  Further, as Respondent correctly points out, during the course of the trial there was no evidence presented to prove that Petitioner walked with a limp.  Had Petitioner's trial counsel emphasized Mr. Gill's seemingly inconsistent testimony it would have opened the door to potential exposure of the fact that Petitioner did, in fact, walk with a limp.  If Petitioner truly does have a limp, this demonstration would have served to bolster Mr. Gill's already strong identification.  Thus, impeachment on this issue could have been detrimental to Petitioner's interest.  Finally, because there was no testimony or evidence before the jury that he did limp, Petitioner cannot show that he was prejudiced by the lack of cross-examination on this matter.  As such, Petitioner's claim fails.

3.      Failure to Expose the Falsity in Detective Prudhomme's Testimony

Petitioner claims that trial counsel was ineffective for failing to impeach Detective Prudhomme when he testified that he heard a description of the suspect car broadcast over the police radio in the early morning hours of March 13, 1994.  (Respondent's Exhibit S, at 15-16, 24.)

Trial counsel's decision regarding the cross-examination of witnesses falls within the

1   range of appropriate trial strategy.  United States v. Rodriguez-Ramirez, 777 F.2d 454, 458 (9th

2   Cir. 1985); United States v. Murray, 751 F.2d 1528, 1535 (9th Cir. 1985) (citing Gustave v.

3   United States, 627 F.2d 901, 904 (9th Cir. 1980) ("[m]ere criticism of a tactic or strategy is not in

4   itself sufficient to support a charge of inadequate representation.").

5          As Respondent submits, counsel's decision not to question Detective Prudhomme about

6   this issue was clearly a tactical choice.  By not cross-examining him about this subject, trial

7   counsel never gave Detective Prudhomme an opportunity to clarify or explain the situation.  As

8   such, at the conclusion of the testimony there was an ambiguity about whether a description was

9   put out over the radio or not.  Accordingly, Petitioner's trial counsel could, and in fact did (RT III

10  at 357-358), present this apparent ambiguity to the jury during closing argument in an attempt to

11  suggest that Detective Prudhomme was not a reliable witness.  Had counsel given Detective

12  Prudhomme the opportunity to clarify the situation he would not have been able to do this.

13  Therefore, it appears clear that the decision not to question Detective Prudhomme about this

14  issue was a tactical one.

15         Further, even assuming that Petitioner could show that counsel's performance was

16  objectively unreasonable, he cannot show that there is a reasonable probability that, but for

17  counsel's unprofessional errors, the result of the proceedings would have been different.  As

18  described above, the evidence against Petitioner was strong; both victims identified Petitioner as

19  being the man who robbed them, and law enforcement caught Petitioner in the car after the high

20  speed chase.  (RT II at 64, 170-171, 192.)  Given the strength of the evidence, whether

21  Petitioner's trial counsel had cross-examined Detective Prudhomme about hearing a description

22  of the vehicle leaving the scene of the crime would not have had any effect on the jury's verdict.

23         4.     Trial Counsel Stated Erroneous Facts in Closing Argument Thereby Lending
                  Credence to the Prosecution's Case and the Detective's False Testimony

24         Petitioner contends that his counsel was ineffective by stating erroneous facts in closing

25  argument, thereby lending credence to the prosecution's case, and Detective Prudhomme's

26  alleged false testimony.  Specifically, Petitioner claims that his

27         [c]ounsel stated that the vehicle description given by one of the witnesses on the
           12th was that of a "sedan," which could have been a 4-door vehicle.  (RT [III at
28         353].)  Counsel completely failed to notice that the description of the vehicle

16

given by the witness on the 12th was of a 2-door, and that witness never testified to seeing a "sedan."  The police report states that the suspect vehicle was a 2-door. Counsel failed to bring this fact to the attention of the jury, and misstated the witnesses testimony during closing arguments by saying he testified to seeing a "sedan."

(Respondent's Exhibit S, at 17.)

The witness who gave the description in question, Shawn Horton, described the vehicle that Petitioner fled in as a large, mid-to-early seventies Ford, or similar make, that was light brown or faded in color.  (RT II at 89, 99.)  Further, he was shown five photographs of a vehicle that he testified looked similar to the vehicle that he saw Petitioner get into.  (RT II at 93.)  The vehicle depicted in those photographs, a four-door Ford LTD, was one that Petitioner had borrowed on the day of both robberies, and which Petitioner ultimately crashed following his attempt to allude police officers.  (RT III at 261-266.)  Based on the description given by Mr. Horton, as well as the fact that he identified the vehicle depicted in the photographs as being similar to the one he saw Petitioner get into, it is clear that the vehicle was a sedan, be it two or four door.  Further, since Mr. Horton identified the vehicle in the pictures as being similar, the jury knew exactly what type of vehicle was being described.  Petitioner fails to demonstrate that but for counsel's unprofessional error, the result of the proceeding would have been different.

5.    Trial Counsel Failed to Develop a Viable Defense Strategy and Failed to Make Good on Opening Statement

Petitioner contends that prior to trial he informed counsel that he walked with a limp which therefore made it impossible for him to have outrun Mr. Horton who chased him over an eight block area.  (Respondent's Exhibit S, at 18, 23.)  While Petitioner acknowledges that counsel questioned the witness about whether the person who robbed him walked with a limp, he claims that counsel was ineffective for failing to follow through and present evidence that he did in fact walk with a limp.  (Id. at 18.)

Assuming that Petitioner did tell his counsel that he walked with a limp, counsel's decision not to present this evidence was obviously a tactical one.[7]  As explained above, at trial Mr. Gill, the victim of the second robbery, testified that he noticed that Petitioner walked with a

---

[7] As Respondent points out, even if the assumption is true, Petitioner's claim nonetheless fails.

limp when he entered the store.  To have put on evidence that Petitioner did in fact walk with a limp would only have bolstered Mr. Gill's identification.

Further, as Respondent submits, trial counsel did "make good" on his opening statement. In his opening statement, counsel pointed to numerous inconsistencies in the descriptions given by the victims of the robber.  He claimed that given these inconsistencies the evidence was going to show that Petitioner was not the robber.  (RT of May 2, 1995, at 5-9.)  During the course of the trial, counsel brought these supposed inconsistencies to the jury's attention, thereby making good on his opening statement.  It is noteworthy, given that the jury acquitted Petitioner on two of the charged counts, counsel's tactics were effective.  Petitioner's claim fails.

  6. <u>Trial Counsel Failed to Interview the Sole Defense Witness Before Putting Him on the Witness Stand, Resulting in the Witness Providing Testimony Damaging to Petitioner's Case</u>

Petitioner claims that counsel failed to interview the sole defense witness, Austin Bryan, prior to having him testify, and that as a result Mr. Bryan provided testimony damaging to Petitioner's case.  (Respondent's Exhibit S, at 20, 26.)  Petitioner submits a declaration by Mr. Bryan, who declares that on the day that he was scheduled to testify at Petitioner's trial, Mr. Owens took him into the court hallway and asked him what his relationship was with Petitioner and the other question was unrelated to the trial or events surrounding Petitioner's arrest. (Traverse, attached Exhibit 3.)  Mr. Bryan declares that prior to that, he had not spoken to Mr. Owens or an investigator working on his behalf.  (<u>Id</u>.)

Even assuming counsel was ineffective and did not interview Mr. Bryan prior to trial, Petitioner has failed to demonstrate that but for counsel's error, the result of the proceeding would have been different.

First, as Respondent submits, the record suggests that Petitioner's trial counsel did interview Mr. Bryan prior to trial.  During the pretrial conference, defense counsel mentioned that Mr. Bryan may be a potential alibi witness.  (April 27, 1995, RT at 5, 12.)  The prosecutor indicated that she had not heard of Mr. Bryan before, and asked for further information regarding him.  (<u>Id</u>. at 25.)  Petitioner's counsel indicated that Petitioner had given him Mr. Bryan's name the previous week while he had been involved in another trial, and indicated that, "I haven't even

spoken to the individual myself as of yet." (Id. at 26.)  It is reasonable to infer from this

comment that Petitioner's counsel had not yet interviewed Mr. Bryan, but intended to do so prior

to his testifying at trial.

However, even assuming counsel did not interview Mr. Bryan prior to him taking the

witness stand, Petitioner has not demonstrated any resulting prejudice.  The fact that Petitioner

may have had cash on him on March 12, 1994, does not overcome the fact that both robbery

victims identified him as the suspect, he engaged in a high speed chase, and was arrested on

March 13, 1994, with cash on him.  Petitioner has failed to demonstrate and the record does not

reveal that the result of the proceedings would have been different but for counsel's alleged

unprofessional error.  Thus, the state courts' rejection of this claim was not contrary to or an

unreasonable application of Supreme Court precedent.

7.   Failure to Properly Investigate

Petitioner contends that counsel did not make any type of investigation into his case.

In its answer Respondent indicates that Petitioner seems to make this allegation in

conjunction with his assertion that counsel was ineffective for failing to file a "Pitchess" motion.

(Answer, at 31.)  Therefore, the claim was addressed in relation to Petitioner's "Pitchess" motion

claim.

In his traverse, Petitioner contends that Respondent has failed to address his failure to

investigate claim.  Petitioner attempts to elaborate on this claim.  Petitioner contends that counsel

never sought an investigation into his case and failed to interview any of the witnesses in relation

to their out of court identification.  (Traverse, at 28-30.)  In support of his argument, Petitioner

has submitted a declaration by Jim Larma, Chief Investigator at the Kern County Public

Defender's Office who declares that Petitioner's trial counsel never sought an investigation into

his case.  (Traverse, Exhibit 4.)

As previously stated herein, with regard to Petitioner's claims of incompetence, Petitioner

makes bare assertions in the instant petition (see Petition, at 6); therefore, the Court, as did

Respondent, assumes that Petitioner is making the same arguments as he did before the

California Supreme Court and must utilize that petition to provide detail to the current petition.

Case 1:04-cv-05756-AWI-DLB   Document 22   Filed 12/13/05   Page 20 of 25

In reviewing Petitioner's claim as presented to the California Supreme Court, it was reasonable for Respondent to conclude that the failure to investigate claim was made in relation to the claim that counsel failed to file a "Pitchess" Motion.  To the Supreme Court, Petitioner argued

> Petitioner informed counsel of his prior dealings with Detective Prudhomme, and of Prudhomme's dishonesty and history of abusing his authority.  Counsel failed to conduct any investigation into these matters, and, as far as petitioner knows, never conducted any independent investigation into the charged offenses nor interviewed any prosecution witnesses to determine, among other things, what influence Prudhomme might have had on them.

(Respondent's Exhibit S, at 27.)  Thus, Petitioner's claim that counsel failed to investigate was made in relation to counsel's failure to file a "Pitchess" motion to reflect the Detective's alleged bias.  Therefore, a separate claim that counsel failed to investigate is unexhausted.  However, even were the Court to excuse exhaustion, the claim fails on the merits.[8]  Petitioner has not demonstrated that even had counsel interviewed the prosecution witnesses, he would have discovered any information that would have had an effect on the outcome of the trial.  Thus, Petitioner has failed to demonstrate a reasonable probability that but for counsel's alleged unprofessional error, the result of the proceedings would have been different.  Strickland, 466 U.S. at 694.

        8.        Failure to File "Pitchess" Motion

        Petitioner contends that counsel failed to file a "Pitchess" motion in an attempt to discover whether citizen complaints had been made against Detective Prudhomme. (Respondent's Exhibit S, at 20, 27.)  Petitioner claims that Detective Prudhomme was a "dishonest cop" who, along with a group of other police officers, had terrorized both he and his mother. (Id. at 20.)  Petitioner claims that he informed his counsel of this, and further told him that he believed that numerous complaints had been filed against the detective. (Id. at 21.)

        Pursuant to Pitchess v. Superior Court, 11 Cal.3d 531 (1971), in certain circumstances, the defendant may compel discovery of an officer's personnel files, including citizen complaints.

        Again, Petitioner has failed to demonstrate prejudice.  Even assuming Detective Prudhomme gave false testimony at trial, Petitioner fails to demonstrate how a Pitchess motion

---

[8] See 28 U.S.C. § 2254(b)(2); Gatlin v. Madding, 189 F.3d 882, 889 (9th Cir. 1999).

would have altered the outcome of his case.  Petitioner merely speculates that exposing the

Detective's bad character along with the falsity of his testimony would have cast a cloud over the

integrity of the prosecution's case and raised a reasonable doubt in the minds of the jurors.

Further, as Respondent argues, even assuming that counsel filed a Pitchess motion and obtained

material in the detective's personnel file, and it was introduced at trial, it would not have had any

impact on the testimony of the two robbery victims who identified Petitioner as being the man

who robbed them, or the officers who were lead on a high speed chase.

   9. <u>Failed to Make Any Effort to Obtain Records of the Cash Evidence Deposit</u>

  Petitioner claims that his trial counsel was ineffective for failing to make any effort to

obtain records relating to the deposit of the money recovered from his person at the time he was

apprehended by authorities.  (Respondent's Exhibit S, at 21, 24-25.)  Petitioner claims that had

counsel obtained such records it would have shown either that no deposit occurred or, if it did, it

was only for $56 or $58.  (<u>Id</u>. at 25.)

  Even assuming that such records exist, Petitioner does not demonstrate how it would

have had the potential to change the outcome of the trial.  Although Officer Rice initially testified

that he recovered $58 from Petitioner, he subsequently testified that he recovered $86 and gave

the denominations that made up that amount.  (RT III at 270.)  Further, even if the records

existed, and even if they showed that an amount different from $86 had been deposited,

Petitioner cannot show that he suffered prejudice as a result of his counsel failing to seek these

records.  As Respondent argues, even if Petitioner had $56, $58, or no money on him at the time

of his arrest it would not change the fact that he was identified by Mr. Gill as being the man who

robbed him on March 13, 1994.  Further, it would have no impact or relevance on Ms. Koelzer's

identification of Petitioner as being the man who robbed her on March 12, 1994.  Finally, it

would have no impact on the fact that Petitioner led authorities on a high speed chase.  As such,

Petitioner cannot "show that there is a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceedings would have been different."  <u>Strickland</u>, 466

U.S. at 694.

///

1        10.    Trial Counsel Denied Petitioner the Right to Testify on His Own Behalf by
               Failing to Properly Explain Court Rulings Regarding the Use of Prior Convictions
2              for Impeachment Purposes

3        Petitioner contends that his trial counsel denied him the right to testify on his own behalf

4   by failing to properly explain the trial court's ruling regarding the use of his prior convictions for

5   impeachment purposes should he choose to testify.  (Respondent's Exhibit S, at 19, 26-27.)

6   Specifically, Petitioner alleges that he told his counsel that he wanted to testify, and that in turn

7   his counsel told him that if he did he would be impeached with his entire criminal history.  (Id. at

8   19.)  Petitioner claims that his counsel never advised him that the court had ruled that if he

9   testified he could only be impeached with one of his priors, and that prior would be sanitized.  He

10  claims that had he been informed of the court's ruling he would have testified.  (Id. at 19.)

11       In limine, the prosecution moved to impeach Petitioner with his prior convictions should

12  he choose to testify.  (RT of April 27, 1995, at 26-44.)  The trial court engaged in a detailed

13  discussion about the consequences of Petitioner taking the witness stand.  Petitioner was present

14  during this hearing, was paying attention to, and engaged in the proceeding.  This was evidenced

15  by the fact that when Petitioner's counsel was explaining to the court that Mr. Bryan would be

16  providing an alibi for Petitioner with regard to one of the robberies, Petitioner stopped his

17  counsel and clarified that Mr. Bryan was not an alibi witness.  (Id. at 27-28.)  After extensive

18  discussion on the matter the court, in Petitioner's presence, ruled that should Petitioner testify he

19  could be impeached with only one of his prior convictions, and that the prior would be sanitized

20  so that it could only be referred to as a theft related conviction.  (Id. at 39-42.)  However, the

21  court went on to state that if Petitioner were to testify and say anything that would make the

22  priors appropriate for impeachment use, they might all come in to evidence.  (Id. at 43.)

23  Specifically, the court stated:

24       THE COURT: I'll give you one better, I will remind Mr. Owens
         [Petitioner's trial counsel] of what I said in connection with the last trial that it
25       probably would be a good idea for him to consult with [Petitioner] to find out
         what [Petitioner] intends to say while testifying, if he testifies.
26            It probably would be a really good idea for Mr. Owens, when he has that
         conversation, to reaffirm what I'm about to say now, if [Petitioner] gets up and
27       says anything that would make these priors appropriate for impeachment use you
         know, something other than credibility, I will guarantee you, I will allow [the
28       prosecutor] to impeach with the 1971 prior, the 1986 prior, as well as the 1989
         prior.

                                              22

1           So if [Petitioner] gets up on the witness stand and says that he never stole
a nickel from anyone, ever in his life, and he just wouldn't do that, Ms. Grabert,
2    you get out your papers.

3    (RT of April 27, 1995, at 43.)

4           At the end of the first day of testimony the court made the following comments:

5           THE COURT: The record will reflect that the jurors have left, and I am
going to do now what I do in every trial at about this time and that is I am going to
6    remind Mr. Owens [defense counsel] to do what I know he will do, and that is to
talk with his client about his right to testify or his right to remain silent.
7           I want him to get together with him, if he can, this evening so they can talk
about all the pros and cons and then Mr. Owens, as I know you will do, you will
8    remind your client that the final decision as to testify or not to testify is his.
       He should make that decision only after listening to and considering what
9    you might have to say, and he should also draw upon any previous experience he
might have in that regard and he should really think about the type of case against
10   him.
       He should take everything into consideration and then he should
11   understand that I don't care what his decision is.  It makes no difference to me.
But if he does not take the stand, nothing will be said other than we will give the
12   instruction that covers that and he won't later complain that Mr. Owens wouldn't
let him take the stand or told him not to take the stand.
13          If he does take the stand, he will answer the questions posed to him by Mr.
Owens as well as any cross-examination by the D.A. and we'll go from there.
14          If he does take the stand, I don't want you to take the waiver in front of the
jury.
15          [PETITIONER]: What is the waiver?
       THE COURT: Well, he will explain that to you.  Okay.  I really think you
16   know what it is, but if you don't, he will explain it tonight, and that's why I am
doing this now so you folks will have plenty of time to talk about that and we
17   won't keep that jury waiting tomorrow while you talk that over.

18   (RT II at 258-260.)

19          Shortly before the defense rested the court asked Petitioner's counsel whether he needed

20   time to talk to Petitioner about testifying.  Counsel responded, "I did speak with him at some

21   length last evening, but I will check with him and see if his feeling this morning is the same as it

22   was last night."  (RT III at 297.)

23          The transcript of the record in this case belies Petitioner's claim that counsel did not

24   inform him of the court's ruling if he chose to take the witness stand.  The trial court went to

25   great length to assure that Petitioner was well advised, through his trial counsel, of the choice to

26   testify.  The court specifically instructed Petitioner's counsel to talk to Petitioner about the pros

27   and cons of testifying so that, "[Petitioner] won't later complain that Mr. Owens [Petitioner's

28   trial counsel] wouldn't let him take the stand or told him not to take the stand."  (RT II at 259.)  It

is significant to note that Petitioner was engaged enough in this conversation to question the court about what type of waiver it would take before he testified in front of the jury.  (RT II at 259.)  It is likely that Petitioner's counsel, as the court instructed, told Petitioner that there was a scenario under which his entire criminal history could be presented.  As previously noted, the trial court specifically instructed trial counsel to inform Petitioner that if he opened the door by saying something that would make the priors appropriate for impeachment use the rest of the priors would come in.  (RT of April 27, 1995, at 43.)

Even assuming that trial counsel did not inform Petitioner of the court's ruling, and further assuming that that is why Petitioner chose not to testify, Petitioner has not shown how he was prejudiced.  In his traverse, Petitioner contends that even if he was going to say only four words, "I didn't do it," he had a fundamental right to do so.  Petitioner fails to demonstrate how such testimony would have had an impact on the jury's verdict and therefore there is not a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different.  <u>Strickland</u>, 466 U.S. at 694.

F.      <u>Insufficient Evidence to Support Felony Conviction for Evasion of a Peace Officer</u>

Petitioner contends that there is insufficient evidence to support his felony conviction for evasion of a peace officer by driving with willful or wanton disregard for the safety of persons or property.

Respondent argues that this claim is unexhausted.  In his traverse, Petitioner concedes that the claim is unexhausted and he has chosen to abandon the claim.  (Traverse, at 33.)  Because Petitioner has withdrawn the claim from the petition, the Court does not address it and it will be dismissed from the action.

RECOMMENDATION

Based on the foregoing, it is HEREBY RECOMMENDED that:

1.      The insufficiency of the evidence claim be dismissed from the action for failure to exhaust;

2.      The petition for writ of habeas corpus be DENIED; and

3.      The Clerk of Court be directed to enter judgment in favor of Respondent.

24

1    These Findings and Recommendations are submitted to the assigned United States

2  District Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 72-

3  304 of the Local Rules of Practice for the United States District Court, Eastern District of

4  California.  Within thirty (30) days after being served with a copy, any party may file written

5  objections with the court and serve a copy on all parties.  Such a document should be captioned

6  "Objections to Magistrate Judge's Findings and Recommendations."  Replies to the objections

7  shall be served and filed within ten (10) court days (plus three days if served by mail) after

8  service of the objections.  The Court will then review the Magistrate Judge's ruling pursuant to

9  28 U.S.C. § 636 (b)(1)(C).  The parties are advised that failure to file objections within the

10  specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951

11  F.2d 1153 (9th Cir. 1991).

12    IT IS SO ORDERED.

13  **Dated:    December 13, 2005**                          **/s/ Dennis L. Beck**
   3b142a                                                    UNITED STATES MAGISTRATE JUDGE

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28